**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

Ronald Hickman,

          Plaintiff,

v.                               ACTION NO. 2:03cv363

Lt. Tracey A. Jackson, et al.,

          Defendant.

UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C.§ 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia, by order of reference entered September 16, 2004.

## I.  PROCEDURAL BACKGROUND

Petitioner, a Virginia inmate, brings this pro se action pursuant to 42 U.S.C. § 1983, to redress, via compensatory damages, alleged violations of his constitutional rights.  Specifically, petitioner alleged that he was put on strip cell status, denied running water and cleaning supplies, kept in a cell that was cold, and seen naked by female correctional officers.  On June 2, 2004, defendants filed a motion for summary judgment against all of these claims. Petitioner filed appropriate memoranda and affidavits in rebuttal.  On September 16, 2004, Judge Henry Coke Morgan, U.S.

1

District Judge, granted summary judgment to the defendants on all but one claim. The remaining right to privacy claim involved female guards allegedly viewing petitioner, a male inmate, naked. Since neither party moved for a jury trial, the remaining privacy claim was referred to Magistrate Judge F. Bradford Stillman for subsequent hearings and recommendations.

On November 17, 2004, petitioner filed a motion for appointment of counsel pursuant to 28 U.S.C. § 1915(e)(1). Though a court is not authorized to compel an attorney to represent an indigent litigant under § 1915(e)(1), a court may nevertheless request such representation. The court asked R. Johan Conrod, Jr., Esq., to act in this capacity pro bono; he consented and the court approved Mr. Conrad as counsel for petitioner. Document No. 25. Therefore, the court granted petitioner's motion for appointment of counsel.

On November 19, 2004, defendants motioned for a protective order regarding petitioner's discovery. They contended that the requested discovery went beyond the subject matter and time-frame of the remaining (privacy) issue. While petitioner filed an objection and motion to dismiss regarding this motion for protective order, the court granted defendant's motion on December 29, 2004. The court order compelled defendants to answer interrogatories and produce documents "subject to the limitation that their answers and responses shall be confined to petitioner's

2

privacy claim." New discovery deadlines were set.

On February 7, 2005, the parties held a pre-hearing conference to discuss proposed exhibits. Counsel for the petitioner was directed to deliver proposed exhibits to the court within ten (10) calender days; defendant was ordered to file his objections by February 22, 2005. An evidentiary hearing was set for March 1, 2005, whereupon arguments were heard and various exhibits received into evidence. On July 8, 2005, defendants submitted their proposed findings of fact and conclusions of law; on July 18, 2005, petitioner submitted his proposed findings of fact and conclusions of law.

## II. <u>FINDINGS OF FACT</u>

The defendant Ronald Hickman is a 23 year old African American male currently incarcerated at the Nottoway Correctional Center in Burkeville, Virginia. He has been convicted of, and is serving time for, upwards of five felonies. Hickman Test. at 38. Prior to his transfer to Nottoway, Hickman was housed at the Northern Neck Regional Jail ("NNRJ") in Warsaw, Virginia. There, he was known as a "problem inmate" with a history of erratic behavior and psychiatric disturbances.[1] Haydon Test. at 65.

---

[1] By the time period in question, Hickman had a record of ten prior incidents of prison misconduct, including general threats to himself and others, threats to break a cell sprinkler or other property, destruction of property, and possession of prohibited devices. Def.'s Ex. 1 at D0011-D0023.

The court notes nine exhibits were admitted. Though pages within seven of these exhibits were numbered, pages in two were

At approximately 6:00 p.m. on February 19, 2003, Lieutenant Darryl Turner began his duty period at NNRJ.  Lt. Turner was acting as "shift man," or supervisor in charge of routine matters during his shift.  Haydon Test. at 79; Turner Test. at 122.  One and a half hours into his shift, Lt. Turner received a call on the radio that inmate Hickman was "acting very erratic" in his cell – hanging on the door, screaming, and threatening to break the sprinkler head in his cell.  Turner Test. at 118.  Given Hickman's history of damaging jail property,[2] Turner took immediate action: He ordered the inmate transferred to the medical unit of the jail where Hickman was buckled into a restraint chair and placed under camera supervision.  Turner Test. at 118.  Within minutes of leaving the room, Turner and other guards observed Hickman unsnap a buckle on the restraint chair.  It became clear to them that Hickman was using a tool to pry loose.  Id.; Pl.'s Ex. 2 at D0024.  Turner gathered four other male officers and reentered the cell for a strip search.  Turner Test. at 118, 119.  Hickman violently resisted the strip search; it required the full force of all five officers to keep him under control and reclaim the hidden tool – a paper clip Hickman had clasped in his fist.  Turner Test. at 119; Pl.'s Ex. 2.

---

not: Def.'s Ex. 7, Medical Records and Def.'s Ex. 3, Cell Photographs.  The court references materials in these unnumbered exhibit pages by using the title of the page.

[2] Id.

At nearly 8:00 p.m. that evening, immediately following the
strip search, Hickman was forcibly re-clothed and placed back into
the restraint chair.  Officer McKenney, one of the five officers
who performed the strip search, reported that Hickman was re-
clothed in his "undergarments."  Pl.'s Ex. 2 at D0030.  Lt. Turner
testified that Hickman was re-clothed in his underwear and a paper
gown (Turner Test. at 119-120); Turner's written report, however,
suggests the gown was not given until later (Pl.'s Ex. 2 at D0027).
The three other responding guards made no mention of Hickman's
state of dress upon returning to the chair.  Pl.'s Ex. 2 at D0024-
D0025; Pl.'s Ex. 2 at D0029-D0031.  Hickman testified he was re-
clothed in his underwear.  Hickman Test. at 21.  Because Hickman
does not allege he was inappropriately viewed naked by female
guards while in the restraint chair, it is unnecessary to make a
finding of fact as to Hickman's exact dress at this time.

At approximately 9:50 p.m., two hours after being placed in
the restraint chair, a nurse was called to confirm Hickman was not
hurt during the strip search.  Defs.' Ex. 7 at Nurse's Notes.  The
nurse did not report any injuries. Id.  Around this same time, Lt.
Turner phoned his supervisor, Captain Virgil Scott Haydon, at home
to apprise him of the Hickman incident.  Lt. Turner had decided to
keep Hickman in the restraint chair a while longer; Haydon approved
this decision.  Pl.'s Ex. 2 at D0027; Haydon Test. at 69.  Hickman
remained in the chair for six more hours, though the duration was

interrupted for a bathroom and exercise break.   Pl.'s Ex. 2 at D0027.

### 1. At minimum, Hickman was clothed in a paper gown while in transport to the SpJ cell.

At 5:00 a.m the following morning, February 20, 2003, Hickman was removed from the restraint chair and, according to Lt. Turner's written report, given a paper gown.  Pl.'s Ex. 2 at D0027.  This paper gown would have gone on top of the undergarments Turner, McKenney, and Hickman attested were placed on Hickman following the strip search.  Id. at D0030; Turner Test. at 119; Hickman Test. at 21.  While Hickman asserts he did not receive a gown then, or at any other time before February 22, 2003, this court does not doubt the accuracy of Lt. Turner's incident report.[3]  Further, testimony shows Hickman was seen in a gown (Burrell Test. at 133) and that gown remnants were later noted on Hickman's subsequent cell floor (Fulcher Test. at 94).   These future gown sightings circumstantially corroborate Turner's reported transfer of a gown at 5:00 a.m. on February 20th.

At 2:40 p.m. on February 20, 2003, Hickman was evaluated in his medical unit cell by a jail psychiatric counselor.  The counselor noted Hickman's behavior and disposition.  Defs.' Ex. 7

---

[3] Lt. Turner's report was written the same day, February 20, 2003.  Def.'s Ex. 3 at D0026.

6

at Mental Health Notes.  That evening, a decision was made[4] to move Hickman to a Special-J ("SpJ") cell.  Haydon Test. at 69.

Hickman does not contend that he was improperly clothed during transport to the SpJ cell.[5]  Jail policy would also support the contention that he was adequately clothed; according to Captain Haydon's description of jail policy, "[a]t no time does any inmate walk through the halls of the regional jail without some type of clothing on."  Haydon Test. at 72.

## 2. **Hickman's paper gown was not removed upon his entrance into the SpJ cell**

Hickman contests his state of dress upon entering the SpJ cell.  He denies he received a paper gown and alleges that Captain Haydon, not present at the transport (Haydon Test. at 73), directed the guards to remove his t-shirt and boxers, leaving him completely naked within the cell.  Hickman Test. at 22-23.

---

[4] The decision to move Hickman to an SpJ cell was likely made by Captain Haydon.  Haydon Test. at 69. Haydon suggested the SpJ cell was chosen because that cell's ceiling was higher, making it more difficult for Hickman to tamper with the sprinkler head.  Id. at 70.  Conversely, Hickman contends the sprinkler in SpJ could be tampered with.  Hickman Test. at 31. Petitioner's counsel cites this disagreement to discredit Haydon.  Pet'r's Findings of Fact at ¶ 25-28.  This court finds the height of the cell has little bearing on Haydon's credibility; the ceiling in SpJ is indisputably higher than the ceiling in a normal cell. Haydon Test. at 70.  Even if Hickman could have reached the SpJ sprinkler, it would have taken more effort than would have been required in his normal cell.

[5] Hickman suggests he was clothed en route to the SpJ cell, but that his clothes were removed once there (the transporting guards "left" him in SpJ without clothing).  Hickman Test. at 23.

Notwithstanding Hickman's claims, there was no evidence
presented at the hearing that such an order had been given.  In
fact, while Captain Haydon never directly commented on whether he
had given such an order, an answer in the negative can be credibly
implied given Haydon's insistence that such an order would have
directly contravened jail policy.[6]  Haydon Test. at 80.  Given a
lack of evidence supporting Hickman's allegations and the weight of
evidence supporting Haydon's assertion, this court finds that
Hickman's gown was <u>not removed</u> when Hickman entered the SpJ cell.
Minimally, Hickman was left wearing the paper gown received, per
Turner's report, at 5:00 a.m.  Maximally, Hickman was wearing both
his underwear[7] and the paper gown.

In addition to noting that the paper gown was reported given
and not reported taken away, further corroboration of Hickman's

---

[6] At the hearing, Haydon remarked that suicide watch is the
"main reason" jail officials would remove an inmate's clothing.
Haydon Test. at 80.

[7] While two credible guards, and the petitioner himself,
claimed Hickman was re-clothed in his undergarments after the
search on February 19th, neither side discussed the fate of the
underwear either on brief or in the hearing.  This court notes
several possible reasons the underwear was not further discussed:
It could have become too soiled for wear while he was still in
the medical unit cell; it could have been removed by Hickman
himself once he reached the SpJ cell; it could have been removed
by jail officials at any point for safety reasons.
  While it is unclear exactly when Hickman stopped wearing the
underwear, the record is clear that by the February 22nd, he no
longer had them on. <u>See</u> Fulcher Test. at 94 (stating by that date
"[Hickman] wasn't wearing anything, not that I can really
remember.")

access to a gown is evident in the record.   First, female guard
Sgt. Carolyn Burrell saw Hickman wearing a paper gown for meals on
both February 21, 2003, and February 22, 2003.   Burrell Test. at
133.   Second, on February 22, 2003, Sgt. Earl Fulcher noticed
"pieces of what looked to be [a paper gown that] had been torn or
what have you, on the floor of the cell."   Fulcher Test. at 94.
Third, the record does not suggest Hickman complained of a lack of
clothing.[8]

Hickman does not specifically allege that any female guards
saw him naked on February 20, 2003, his first day in the SpJ cell.
In fact, neither of the female guards named as defendant were
working that day.   Jackson Test. at 113; Burrell Test. at 130.

### 3. Sgt. Burrell did not see Hickman naked on February 21st, 22nd, or 23rd, 2003.

Hickman's first interaction with a female guard came the next
day, February 21, 2003. As would be her duty for both the 21st and

---

[8] Hickman claims he spoke with Sgt. Burrell "plenty of
times" when Burrell served him food.   Despite his allegation that
she saw him naked on all of these occasions, he claims he only
asked her for cleaning supplies, a mattress, and a blanket.
Hickman Test. at 24.   Hickman did not testify that he asked her,
or any guard, for clothing or that he had asked to speak to a
supervising guard about obtaining clothing.

Further, Lt. Jackson and Sgt. Burrell testified that Hickman
had not requested clothes and that he had not requested to speak
to a higher ranking guard on any matter.   Lt. Jackson Test. at
103; Sgt. Burrell Test. at 134.

22nd,[9] Sgt. Burrell, assisted by an inmate-server, brought Hickman food.  Hickman Test. at 25-26.  Hickman asserts Burrell saw him naked and made derisive comments about the size of his penis during the service of these meals.  Hickman Test. at 25-26.  This court finds two reasons that Burrell did not see Hickman naked on either food service occasion: First, because Burrell's testimony is credible and, second, because Hickman's own statements are not credible given the lack of evidence in support of, and his own failure to make any discernable complaint about, his condition.

First, the court finds Burrell's testimony that Hickman was clothed on both February 21st and February 22nd to be credible because it can be corroborated for each of the days in question.  On February 21st, the court believes Burrell saw Hickman clothed during service of lunch because the nurse who attempted[10] to give Hickman his medicine that evening failed to note a lack of clothing when she "would have charted [any nakedness]."  Tallent Test. at 84.  In fact, Nurse Tallent testified that she "probably" would have made a notation had Hickman been clad merely in his underwear.

_____

[9] Burrell did not work on either February 20th or 23rd. Burrell Test. at 130; see also Def.'s Ex. 6 at D0053 (segregation activity sheets noting Burrell did not administer food service to Hickman on either of those two days).

[10] The evidence reveals Nurse Kelly Tallent attempted to give Hickman his medicine at 9:55 p.m. on February 21, 2003.  Def.'s Ex. 2 at D0038.  However, Hickman refused her requests to come to the doorway and retrieve his pills; she refused to enter the cell because there was "[bowel movement] all over."  Tallent Test. at 84.  The jail log noted this exchange.  Id.

Id. at 88.   Therefore, because Hickman was clothed late on the
21st, at his 9:55 p.m. pill call, the court finds it logical to
credit Burrell's testimony that he was clothed earlier, at
Burrell's service of lunch.

On February 22nd, Sgt. Burrell served Hickman both breakfast
and lunch.   Def.'s Ex. 6 at D0053.   While Hickman asserts
otherwise, Burrell claims Hickman was clothed in a paper gown
during service of both meals.   Burrell Test. at 133.   Sgt. Earl
Fulcher, another guard, saw remnants of a gown later that day.
Fulcher Test. at 94.   Based on these facts, the court credits
Burrell's testimony that she saw him clothed[11] and concludes Hickman
shredded his gown between Burrell's service of lunch on the 22nd
and Fulcher's subsequent walk-through.

Second, the court finds Burrell did not see Hickman naked
during her service of food because of Hickman's own incredible
testimony.   Hickman's only refutation to Burrell's contention is in
stating he had not received a gown by that date.   He does not claim
to have asked Burrell for clothing nor claim to have asked Burrell
to speak with a supervising guard.   In fact, the record does not
suggest Hickman made any discernable complaint about his alleged

---

[11] Burrell's testimony was not impeached at the hearing.   She
did not give contradictory statements nor was there a suggestion,
overt or based on her demeanor, that her character or motives
were questionable.

11

lack of dress or Burrell's alleged derisive comment.[12]  This court
finds that if Burrell had seen Hickman naked and made a derisive
comment about his penis, then Hickman –given his volatile and vocal
nature–[13] would, and could, have taken any number responses, the
least likely of which was silence.

**4. <u>Lt. Jackson did not see Hickman naked on February 21st, 22nd,</u>**

**<u>or 23rd 2003.</u>**

Throughout February 21st, 22nd, and 23rd,  Lt. Jackson also
interacted with Hickman; she was a supervising guard tasked with
signing off on the segregation logs.  Jackson Test. at 106.
Jackson admits to interacting directly with Hickman on two
occasions during his stay in SpJ in the pertinent time period:[14]
First, on an unspecified date, Jackson spoke to Hickman through a

_____

[12] <u>See</u> footnote 8, <u>supra</u>. The court notes Hickman claims he
requested writing utensils from a male guard, Lt. Herbert Wright.
Hickman Test. at 33-34.  Hickman alleges Wright replied Hickman
could not have "anything."  <u>Id.</u>  Hickman also alleges Burrell
told him he could have "nothing."  <u>Id.</u>  Direct examination of
Hickman appeared to evince that "nothing" included clothing, but
this court cannot, without more, assume Hickman had issued a
request for clothing.

[13] Less than forty-eight hours before Burrell's first food
service, Hickman was documented yelling in his cell as well as
yelling and cursing when placed in a restraint chair.  <u>See</u> Pl.'s
Ex. 2 at D0028; Defs.' Ex. 7 at Nurse's Notes.

[14] As noted above, Lt. Jackson was not working on February
20th, 2003. However, she signed Hickman's segregation activity
sheet for February 21st through 23rd.  Def.'s Ex. 6 at D0053.
Thus, the "pertinent time period" mentioned above necessarily
includes February 23rd because Jackson did not remember the dates
of her conversations with Hickman.  Jackson Test. at 102; 111-
112.

gap in the cell door after Hickman had called her over.  Second, on another unspecified date, Jackson spoke briefly with Hickman when she was filling out his segregation log sheet.  Jackson Test. at 112.  The court finds Jackson did not see Hickman naked on either of these two occasions.

First, Lt. Jackson alleges that on an unspecified date she was performing a walk-through of the facility when Hickman "asked [her] to come over to the cell."  Jackson Test. at 102-103.  Lt. Jackson admits to approaching Hickman's cell and to "[carrying] on a conversation through the door with him."  Id.  The topic of conversation was the "supplies"[15] Hickman had requested.  Id. at 111.  This court finds that Jackson did not see Hickman naked because the SpJ cell door and flaps were locked closed, thereby obscuring Jackson's ability to see Hickman's person during this conversation.

In finding that Jackson did not see Hickman naked during this impromptu exchange, this court considered the architecture of the SpJ cell door: unlike conventional cells with barred doors, the sliding door to this SpJ cell is solid blue metal surrounded by solid white cinder-block.  See Def.'s Ex. 3, Cell Photographs.  The

---

[15] Lt. Jackson did not clarify what she meant in referencing "supplies." However, Hickman suggests that, "at one point I was asking her for cleaning supplies to clean the cell out...I was also asking her for mattress [sic] and the blanket."  Hickman Test. at 24.  Neither Hickman nor Jackson alleges the conversation was about lack of clothing.

right side of the door is separated from the wall by a ¼ to ½ inch gap which runs the length of the door.  Jackson Test at 114.  This gap appears to be a purposeful design element.  Id.  Beyond this slight gap, the door contains two openings: a food slot and a glass window.  The food slot and window are both covered by metal flaps which, when locked, seal the openings closed.  Def.'s Ex. 3, Cell Photographs.  It appears that if both flaps are locked closed, then there is little way for an individual without a key to see inside of the cell.  Jackson alleges that the impromptu conversation took place through the gap in the closed door (Jackson Test. at 107); Hickman contends it took place face-to-face through the door's unlocked window (Hickman Test. at 139).

    In resolving this fact dispute, the court considered the testimony of various witnesses who suggested both door flaps were locked, as is the routine, during their interactions with Hickman.[16] As such, an individual without a key could not see into the cell. The weight of the evidence suggests the door flaps were locked.[17]

_____

    [16] All three guard witnesses testified that the food/window flaps were closed and locked during their interaction with Hickman on the dates in question.  See Fulcher Test at 99; Jackson Test. at 108; Burrell Test. at 133.  Nurse Tallent did not explicitly state the doors were locked, but did say the food slot flap was closed "until [she] opened the slot to do pill call."  Tallent Test. at 86.  Conversely, Hickman alleges there were times the flaps were closed, but unlocked; in this way, he implied female guards without keys could have seen him naked. Hickman Test. at 23-24, 138.

    [17] See footnote 16, supra.

Since Jackson appears to have had no key,[18] she could not have seen Hickman naked.[19]

Second, Lt. Jackson admits to speaking with Hickman when she was filling out the segregation log. Jackson Test. at 112. For reasons substantially similar to those mentioned regarding the first, impromptu, exchange, the court finds that Lt. Jackson did not see Hickman naked because Jackson did not have a key to the opening flaps and was speaking to Hickman during the thin gap in the door.[20] Jackson Test. at 113.

### 5. **Hickman was re-clothed on February 22, 2003.**

---

[18] Jackson admitted she had access to the key, but claimed she did not routinely carry it during walk-throughs. Instead, the key was kept in the "main control office" located forty feet, and three sets of doors, from Hickman's particular cell. Jackson Test. at 108-109. The court is persuaded that if Jackson had no intention of talking to Hickman before he called her over, it is unlikely that she had the key to his door flaps and therefore the ability to see him naked.

[19] Hickman alleges that, window and food slot aside, the gap in the door is of sufficient size that Jackson could have seen through it. In support of his contention, Hickman testified he could see people in the outside hall. Hickman Test. at 139.
This court finds it unlikely that if the flaps were locked, that Jackson saw Hickman naked through, maximally, a ½ inch crack. Even if Jackson was "close" to the gap in effort to hear Hickman through the door, Hickman would need to have stood in such a way that his private parts were in open view. The court could easily imagine a number of places Hickman could have stood in the cell during such an exchange were he interested in protecting the privacy of his anatomy. Further, to the extent that Jackson might have seen parts of Hickman's person through the ½ inch crack, those exposures were likely brief in duration and fairly unrevealing in scope.

[20] For various reasons it is unlikely that Hickman was seen naked through the gap, see footnote 19, supra.

Hickman admits he received a paper gown following a specific conversation with Sgt. Fulcher on February 22, 2003.[21]  On that evening, Sgt. Fulcher was performing a standard walk-through in Hickman's area.  Fulcher Test. at 92.  Fulcher looked into Hickman's cell and caught the strong odor of feces; as Nurse Tallent had observed the previous evening, Hickman had smeared feces in "finger painting style" throughout the cell.  Id. at 93. Fulcher noted that Hickman was naked at this time and observed remnants of a paper gown on the cell floor.[22]  Id. at 94.  After convincing Hickman to clean up the feces, Fulcher retrieved appropriate cleaning supplies and a fresh, replacement gown.  Id. at 93.

### 6. Hickman was not seen naked by female guards on February 23rd or February 24th.

This court finds Hickman was not seen naked by either female defendant on February 23, 2003, or February 24, 2003.  Sgt. Burrell was not working on these days.  Burrell Test. at 130.  Lt. Jackson

----

[21]  Hickman testified that the cell clean-up and gown provision took place on February 23rd, 2003.  Hickman Test. at 26, 97.  However, the greater weight of evidence suggests the incident occurred on the previous evening, February 22nd: the prison log recorded the event on February 22nd (see Def.'s Ex. 4 at D0032) and the involved guard, Sgt. Fulcher, recalled the proper date as February 22nd (Fulcher Test. at 92).

[22] Cross-examination revealed Fulcher had not physically examined the remnants.  Fulcher Test. at 98.  While petitioner's counsel speculated the remnants may have been pieces of styrofoam trays and not a gown (Pet'r's Findings of Fact at ¶ 18), the integrity of Fulcher's account is unchallenged.

worked on February 23rd but, for reasons discussed above bolstered by Hickman's fresh gown provision on February 22nd, had no reason to view Hickman naked.  It is unclear whether Lt. Jackson worked on February 24th, but prison logs show she did not administer food or other services or sign the segregation logs for that day.  Def.'s Ex. 6 at D0054.

### III. CONCLUSIONS OF LAW

Hickman alleges that jail officials violated his constitutional right to privacy pursuant to 42 U.S.C. § 1983 by allowing female prison guards to view him in a delicate state of undress.

To establish liability under 42 U.S.C. § 1983, a plaintiff must show that a defendant, acting under color of state law, violated plaintiff's constitutional rights and thereby caused plaintiff injury.  <u>See</u> 42 U.S.C. § 1983.[23]  The plaintiff here alleges that his constitutional right to privacy was violated when

---

[23] Title 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

female guards viewed him in a state of undress while he was being housed in an SpJ cell at NNRJ from February 20, 2003 to February 24, 2003.  Petitioner seeks monetary damages as relief.

In determining whether the petitioner is entitled to relief, this court must undertake a dual-pronged analysis.  First, the court must determine whether an inmate is entitled to a constitutional right to privacy.  Second, if so, the court must determine whether the constitutional right has been actionably violated given the facts of the case.

## 1. Right to Privacy

### A. The Source of Inmate Right to Privacy

In Lee v. Downs, 641 F.2d 1117 (4th Cir. 1981),[24] the United States Court of Appeals for the Fourth Circuit addressed the issue of an inmate's right to privacy, clarifying that prisoners retain

---

[24] The constitutional origin of the inmate right to privacy established in Lee is unresolved.  Several courts have held the Fourth Amendment's protection against unreasonable searches and seizures is the source of inmate right to privacy.  See e.g., Cookish v. Powell, 945 F.2d 441 (1st Cir. 1991).  Others have found the right is rooted in the Eighth Amendment's prohibition against cruel and unusual punishment.  See e.g., Johnson v. Phelan, 69 F.3d 144, 149 (7th Cir. 1995).  A third group suggests that both amendments may form the basis for complaint.  See e.g., Cornwell v. Dahlberg, 693 F.2d 912, 914 (6th Cir. 1992).

In reaction to this uncertainty, many courts have simply assumed the constitutional right existed without delving into its exact source.  See e.g., Timm v. Gunter, 917 F.2d 1093 (8th Cir. 1990) writ denied 501 U.S. 1209 (1991) (holding "We proceed in our analysis of this case on the assumption that inmates possess a constitutional right to privacy.  For purposes of this case, it is not necessary for us to decide whether this unenumerated right exists or to define its constitutional foundation or scope, and we expressly decline to do so." Timm at 1097 n.4.

some degree of privacy that is violated upon "involuntary exposure"

to persons of the opposite sex:

> Persons in prison must surrender many rights of privacy which most people may claim in their private homes.  Much of the life in prison is communal, and many prisoners must be housed in cells with openings through which they may be seen by guards.  Most people, however, have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating. When not reasonably necessary, that sort of degradation is not to be visited upon those confined in our prisons.

Lee at 1119.  In Lee, a female inmate asserted that male guards

viewed her naked on two different occasions.  The Lee court analyzed

these two events separately.

In the first instance, a female inmate who had threatened

suicide was ordered to remove her underwear.  The inmate alleged she

told the surrounding males guards and female nurse that she would

voluntarily remove her underwear if the male guards left the room.

Despite this offer, the inmate claims her undergarments were

forcibly removed in the presence of the male guards.  In deciding

the outcome here, the court highlighted three recognized

principles.  First, that "most people...have a special sense of

privacy in their genitals."  Id. at 1119.  Second, that "prison

officials have a duty to protect prisoners from self-destruction or

self-injury."  Id. at 1121.  Third, that "the general employment of

guards may be required to be open to persons of both sexes under

equal employment opportunity legislation." Id. at 1119-1120.   To resolve the tension between the creation of a privacy interest and the subsequent need to limit that privacy interest, the court characterized the privacy right in terms of necessity: "when not reasonably necessary, [involuntary exposure of genitals to members of the opposite sex] is not to be visited upon those confined in our prisons." Id. at 1119 (emphasis added).   In this portion of Lee, the court found the jury had been entitled to accept the inmate's version of the facts, namely that she had been willing to remove her undergarments voluntarily if the males had left the room. In such a case, it would have been "wholly unnecessary" for the guards to be present in the room and to forcibly restrain the inmate.   Lee at 1120.   The court gave determinative force to the lack of necessity, upholding the jury verdict that the inmate's right to privacy had been violated.

In the second instance, the same female inmate set her paper gown on fire.   Male guards were forced to physically restrain her while a female nurse performed a vaginal search for matches.   Lee at 1118-19.   Here, too, the court analyzed reasonable necessity in determining whether a privacy violation had occurred.   For a variety of reasons, the court concluded in the affirmative.[25]

_____

[25] The court found "there was a reasonable necessity for a search of sufficient thoroughness to give assurance that she had no more matches...the fact that an adequate number of female guards was not promptly assembled does not create a permissible inference that such a group could have been assembled with

While <u>Lee</u> involved a female inmate's privacy concern, its lessons have been extended to cases involving male inmates and female guards.   These cases expound upon <u>Lee</u>'s right to privacy by suggesting a basis onto which reasonable necessity may be found. These cases suggest reasonable necessity is intertwined with penalogical interest: if an inmate's privacy can be maintained without compromising prison operations, then that privacy should be respected.

### B. Inmate Right to Privacy: Valid Infringements

In <u>Riddick v. Sutton</u>, 794 F.Supp. 169 (E.D. N.C. 1992), the plaintiff alleged "his right to privacy and freedom from cruel and unusual punishment was violated by the female guards viewing him in a state of undress while he [was] using the shower or toilet facilities at the prison."   The infringement of this right came vis-a-vis a prison regulation authorizing the presence of female guards in areas where males inmates may be naked.   On patrol, female guards would take "quick glance[s]" at male inmates to ensure they were behaving properly.   <u>Id.</u> at 170.   In recommending summary judgment

---

reasonable promptness in the face of the direct testimony that it could not have been." <u>Lee</u> at 1120-1121.

Beyond this necessity reasoning, the court also emphasized that the inmate's own actions contributed to her exposure: "She had removed and burned her paper dress.  Male guards were about, and she must have known that they would see her naked when they entered to quench the fire...Since her genital area was already in full view of the two male guards, it was not an horrendous additional invasion of her privacy that they restrained her limbs while the female nurse conducted the search." <u>Id.</u>

for the defendants, the court applied a four-pronged test
established in Turner v. Safley[26] for determining the reasonableness,
and therefore validity, of a prison regulation which infringes on a
constitutional right: (1) whether a valid rational connection exists
between the prison regulation and the legitimate governmental
interest offered to justify it; (2) whether alternative means of
exercising the right exist that remain open to inmates; (3) the
likely impact that accommodation of the alleged constitutional right
would have on the guards, other inmates, and allocation of prison
resources; (4) the absence of ready alternatives.  Riddick at 171,
citing Turner v. Safley, 482 U.S. 78, 89-90 (1987).  After analyzing
each of these prongs,[27] the court concluded the defendant's

---

[26] The Turner case has significant superceding history.
However, the four pronged test developed within it is still
applied law.  See e.g., Skundor v. McBride, 280 F.Supp. 2d 524
(W.D. Va., 2003) (applying the four Turner prongs in a case
involving an inmate protesting a right to privacy violation
following a body cavity search).

[27] "First, there is a clearly rational relationship between
the practice of surveillance of prisoners in the bathroom and
shower areas by correctional guards of both sexes and the twin
goals of maintaining internal security and equal employment
hiring.  Second, alternative means exist for inmates to maintain
their privacy...inmates are permitted to take a towel with them
into the shower...[or] bring a newspaper...when they are using
the toilet....Third, the removal of female guards from the
bathroom and shower areas would disturb the orderly operation of
the facility...[by causing] shortages of staff...[and/or making
it so that] female guards would be unlikely to receive promotions
without experience manning all duty stations.  Fourth, the record
reflects that [Riddick's prison] has made a good faith effort to
identify and implement possible alternatives that minimize the
intrusions on the inmate's privacy."  Riddick at 172.

regulation was reasonable and, therefore, the violation in plaintiff's right to privacy was "valid." Id. at 173.

In a later case, Ashann-Ra v. Com. of Va., 112 F.Supp.2d 559 (W.D. Va. 2000), a male inmate alleged, inter alia, that his right to privacy had been violated when female guards were able to see him naked while showering in the prison's curtainless shower stalls. Ra at 564. After recognizing the right to privacy established in Lee and noting the Turner criterion for prison regulation validity, the court concluded Ra had experienced an invasion of privacy. They concluded the exposure in Riddick had been "limited" or infrequent, but that the Ra facts pointed to routinized exposure. Citing Cumbey v. Meachum, 684 F.2d 712 (10th Cir. 1982)[28] and other cases,[29] the court held routinized exposure of male inmates' unclothed persons to female guards "may" constitute a constitutional violation. Ra at 565. The court implied Ra's regular and frequent exposure was not reasonably necessary and was therefore a violation of plaintiff's right to privacy. Id. Ra's argument against routinized exposure is logical; were such exposures tolerated, they could negate Lee's

---

[28] In Cumbey, the district court dismissed a pro se plaintiff's claim that "a certain amount of viewing" of his naked person by female guards was a violation of his right to privacy. The appeals court concluded that "a 'certain amount of viewing' by female guards does not necessarily fall short of a cognizable constitutional claim." Id. at 714.

[29] Other cases involving male inmates being viewed by female guards include Bowling v. Enomoto, 514 F.Supp. 201 (N.D.Cal. 1981) and Mudson v. Goodlander, 494 F.Supp. 890 (D.Md 1980).

central holding that "[a]lthough the inmate's right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether." Lee at 1119.

### C. Right to Privacy: Defining Limited or Minimal Exposure

Given the holdings in Riddick and Ra, it is necessary to characterize the alleged exposure as either limited or frequent. Guidance in this regard is provided by Timm v. Gunter, 917 F.2d 1093 (8th Cir. 1990), writ denied 501 U.S. 1209 (1991).

In Timm, a class of inmates at an all-male maximum security institution complained, inter alia, that their constitutional right to privacy had been violated when they were "viewed while partially or totally nude while showering, using toilet facilities, dressing and undressing, and sleeping." Timm at 1097. After applying Turner, the court concluded the inmates were not subject to "constant, intrusive" observation. Id. at 1101. As a result, whatever "minimal intrusions" the inmates faced "were outweighed by institutional concerns for safety and equal employment opportunities." Id. at 1102. The 'minimal intrusions' of Timm include: patrolling female guards who occasionally look through small windows in cell doors and visualizations afforded to female guards positioned in towers thirty feet above a prison yard urinal. Id. at 1101-1102.

Several cases further expounded upon instances which constitute minimal intrusions. In Johnson v. Pa. Bureau of Corrections, 661

24

F.Supp. 425, 435 (D.Pa., 1987), a male inmate claimed a violation of his right to privacy when female guards viewed him unclothed while showering.   <u>Id.</u> at 425.   Ultimately, the court determined the intrusions in <u>Johnson</u> did not rise to the level of a privacy violation: "[W]hile plaintiffs' evidence does indicate the possibility of routine observations, it is the number of actual viewings which is relevant, not the potential for such observation. Aside from plaintiffs' own allegations, no evidence indicates that female guards <u>regularly</u> view plaintiffs or any other prisoners when such individuals are naked..." <u>Id.</u> at 435 (internal citations omitted)(emphasis added).   In yet another case, a male inmate complained that a female prison employee[30] delivering weekly mail to his cell had seen him naked. <u>Avery v. Perrin</u>, 473 F.Supp. 90 (N.H., 1979).   The court held that any exposure to the mail clerk was de minimis; not only did the clerk have minimal occasion to interact with the inmate, but the inmate had several opportunities to cover himself knowing the prison activity schedule (i.e., he could have covered himself at noon, knowing mail call was performed at that time). <u>Id.</u> at 90-92.

## 2. Applying *Lee*'s Lessons: Ronald Hickman

After analysis of evidence presented at the March 1, 2005, hearing, this court has found that inmate Ronald Hickman was clothed

---

[30] Like Sgt. Burrell and Lt. Jackson in the instant case, the female mail clerk in <u>Avery</u> testified she had never seen the inmate naked during her service of mail. <u>Avery</u> at 91.

in a paper gown during all interactions with female corrections officers during the relevant time period.  Finding he was clothed, it is unnecessary to embark upon a right to privacy analysis.[31]

Before concluding, however, this court would note that even if Hickman had been naked in front of female officers as he alleged, there would be no right to privacy violation. Following Turner and Lee, this court concludes that any violation from alleged exposure is outweighed by penological interests.  Further, as it regards Timm frequency of exposure analysis, this court concludes the alleged exposure may be appropriately categorized as infrequent and de minimis.

In alleging a violation of his right to privacy, Hickman suggests that cross-gender supervision was inappropriate for the time period at issue.  Unlike Riddick, Hickman does not challenge a general prison regulation authorizing females in the SpJ cell vicinity.  Instead, Hickman contends that his privacy rights were violated by cross-gender supervision in this particular instance.  As such, this court analyzes whether, under Turner, cross-gender supervision during this particular time period served penological

---

[31] If Hickman had been given a gown, but was seen naked because he had removed it, he would have still have no claim. Returning to Lee, the court held "[the female inmate] had removed and burned her paper dress. Male guards were about, and she must have known they would see her naked when they entered the cell to quench the fire." Lee at 1121.  Likewise, there would be a reduced expectation of privacy here: Hickman would have known that female guards would see him naked on their routine patrol.

interests to the point where Hickman's privacy right is outweighed. This court finds Hickman's privacy interest is outweighed.

The first inquiry from <u>Turner</u> involves identifying a rational connection between the prison regulation (or here, actions by prison officials between February 20, 2003 and February 24, 2003) and the governmental interest offered to justify it.  Turner at 89-91.  As was found in <u>Riddick</u>, here "there is clearly a rational relationship between the practice of surveillance of prisoners...by corrections guards of both sexes and the twin goals of maintaining internal security and equal employment hiring."  <u>Riddick</u> at 172.

The second inquiry from <u>Turner</u>, 482 U.S. at 89-91, questions whether Hickman had alternative means to exercise his right to privacy.  The evidence shows that Hickman, if naked as he alleged, had ample opportunity to protect the sensitive areas of his anatomy from sight.  In the case of Sgt. Burrell, whose alleged viewing occurred during service of food, Hickman could have stood askance of the food slot and window when he retrieved the food from Burrell's inmate assistant. Given the relatively small size of the food slot and window and the solid nature of the surrounding door and wall, several possible vantages existed where Hickman could have protected the privacy of his person.  Alternatively, Hickman could have covered his person with a blanket or other material from the cell.[32]  In the

---

[32] Admittedly, Hickman also contended that he had not received a mattress or blanket.  However, this Eighth Amendment claim was dismissed on summary judgment for failure to show

case of Lt. Jackson, Hickman could have obscured her ability to see his naked person. As footnote 19, <u>supra</u>, suggests, this court notes it would not have been difficult to obscure one's sensitive area from the view afforded by a ½ inch gap.

The third inquiry from <u>Turner</u> surrounds the likely impact that accommodation of Hickman's right to privacy would have had on the guards, other inmates, and the allocation of prison resources generally. Turner at 89-91. This court presumes NNRJ, like other institutions, relies on female guards in meeting staffing needs. If females are excluded from every instance where male inmates may be in a state of undress, then shortages of staff may significantly erode prison security (<u>Riddick</u> at 172) and place the prison in jeopardy of suit.

The final inquiry from <u>Turner</u> involves availability of alternatives readily employable by the jail to minimize privacy intrusions against Hickman. <u>Turner</u> at 89-91. Hickman implies that a paper gown would have readily assuaged his privacy concerns. Notwithstanding this point,[33] the record lacks any complaint made by Hickman during the pertinent period about his state of undress. While this court supports proactive steps taken by prisons in protecting inmate constitutional rights, this court also notes that

---

injury.  Opinion and Order of September 16, 2004.

[33] Again, this court notes that the weight of the evidence suggests Hickman did receive a gown on the morning of February 20, 2003.

a prison's duty to make good faith efforts in protection is not invoked unless it is aware of a problem.[34]

Beyond the four <u>Turner</u> factors, this court must also consider whether the alleged exposure was frequent enough to warrant a privacy violation under <u>Timm</u>. In <u>Timm</u>, the court noted that, among other actions, "[occasional] peering" through cell door windows and "occasional" opening of cell doors did not constitute constant or frequent observation. <u>Timm</u> at 1101. Similarly in <u>Riddick</u>, the "quick glanc[es]" of guards on patrol did not constitute frequent or constant surveillance and was de minimis. <u>Riddick</u> at 173.

Based on the instances described in <u>Timm</u> and <u>Riddick</u>, the court finds Hickman's exposure, as alleged, was not frequent or routine. Throughout his testimony, Hickman did not allege a rough number of times that he might have been seen naked. Even in the most generous estimation, where he was seen naked during every service of food by Burrell and every exchange with Jackson, Hickman was seen naked by female guards acting in the course of their professional duties a total of seven or eight times over the course of four days. This does not rise to the level of constant surveillance, as might occur

---

[34] For example, in the Eighth Amendment context, the Supreme Court held, "a prison official cannot be found liable...for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).

had a camera been installed in the cell or if the door were barred
and not solid (thus affording a constant visual from the hall).  In
sum, because Hickman does neither offer an estimation of the number
of times he was seen, nor contend that such constant, frequent
observation was even possible, any privacy violations should be
considered infrequent and de minimis.

### IV.  RECOMMENDATION

For the foregoing reasons, the court recommends summary judgment
be GRANTED in favor of the defendants and recommends that all
Plaintiff's claims be DISMISSED WITH PREJUDICE.

### V.  <u>REVIEW PROCEDURE</u>

By copy of this Report and Recommendation, the petitioner is
notified that:

1. Any party may serve upon the other party and file with the
Clerk specific written objections to the foregoing findings and
recommendations within ten (10) days from the date of mailing of
this report to the objecting party, <u>see</u> 28 U.S.C. § 636(b)(1)(C)
and Federal Rule of Civil Procedure 72(b), computed pursuant to
Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3)
days permitted by Rule 6(e) of said rules.  A party may respond to
another party's specific objections within ten (10) days after
being served with a copy thereof.  <u>See</u> Fed. R. Civ. P. 72(b).

2. A district judge shall make a de novo determination of
those portions of this report or specified findings or
recommendations to which objection is made.

The parties are further notified that failure to file timely

objections to the findings and recommendations set forth above will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

ENTERED this 3rd day of August, 2005.

                                                 /s/
_____    _____
                                           F. Bradford Stillman
                                           United States Magistrate Judge

## Clerk's Mailing Certificate

A copy of the foregoing Report and Recommendation was mailed

this date to the following:

R. Johan Conrod, Jr., Esq.
Kaufman & Canoles, P.C.
150 West Main Street
Suite 2100 (23510)
Post Office Box 3037
Norfolk, Virginia 23514

Jeff W. Rosen, Esq.
Lisa Ehrich, Esq.
Pender & Coward, P.C.
222 Central Park Avenue
Virginia Beach, Virginia 23462


Elizabeth H. Paret, Clerk

By: _____
Deputy Clerk
August    , 2005

32